# UNITED STATES DISTRICT COURT
# DISTRICT OF MINNESOTA

| | |
|---|---|
| **Justin S. Williams,** | Civil No. 09-2813 (JRT/JJG) |
| Plaintiff, | |
| v. | **REPORT AND RECOMMENDATION** |
| **Commissioner of Social Security,** | |
| Defendant. | |

JEANNE J. GRAHAM, United States Magistrate Judge

This litigation comes before the undersigned on the parties' cross motions for summary judgment (Doc. Nos. 27, 35). Ruth A. Rivard, Esq., represents plaintiff Justin Williams. Lonnie F. Bryan, Assistant U.S. Attorney, represents defendant Commissioner of Social Security. The motions are referred to this Court for a report and recommendation in accordance with 28 U.S.C. § 636(b) and Local Rule 72.1(a).

On March 8, 2006, Mr. Williams (Williams) applied for disability benefits from the Social Security Administration (the SSA). He principally claimed disability due to chronic back pain. After the SSA denied his application initially and upon reconsideration, Williams obtained a hearing before an Administrative Law Judge (ALJ). In a decision on November 14, 2008, the ALJ ruled that Williams was not disabled and denied benefits.

Williams then commenced this action for judicial review, arguing that the ALJ made unsupported findings about his impairment and his ability to work. The parties now bring cross-motions for summary judgment.

I.     BACKGROUND

   A.     March 2001 to December 2003:  Back Injury to Spinal Fusion Surgery

Williams' impairments are traceable to his fall down a flight of stairs at his workplace in March 2001. (Tr. at 139.) Though Williams did not immediately report any problems after the fall, he started reporting back pain to his primary care physician in August 2001. (*See* Tr. at 290.) Radiologic imaging revealed that Williams had a bulging disc in his lower spine. (Tr. at 293.)

At ensuing visits in November 2001, Williams reported that his pain had become very severe. His primary care physician recommended treatment with anti-inflammatory medications, but in contemporaneous notes, this physician considered whether the pain was psychosomatic. (Tr. at 377, 379-80.)

In January 2002, Williams started receiving primary care from Dr. William Smith, who continued in this role for much of the relevant time period here. (*See* Tr. at 356.) Dr. Smith referred Williams to Dr. Andrea Boon, a physician at the Spine Center of the Mayo Clinic.

When Dr. Boon first examined Williams on January 29, 2002, she found that Williams had great difficulty moving his trunk and spine, and that his lower back was very sensitive to touch. Evaluating Waddell's signs, which are used to assess psychosomatic components of pain, Dr. Boon assigned a score of 2 out of 5, below the threshold usually associated with somatic pain or malingering. Dr. Boon gave Williams a primary diagnosis of degenerative disc disease. (Tr. at 340-41.)

In the ensuing months, Williams' physicians considered various options for treating the back pain. Williams began physical therapy, which appeared to relieve his symptoms. (Tr. at 332.) Dr. Smith also prescribed narcotics, finding that such medications provided "adequate" control for Williams' pain. (Tr. at 355.)

Before Williams received a steroid injection on March 11, 2002, he was examined by the two physicians who administered the procedure. At this visit, Williams reported significant pain and said that he could not walk for more than twenty minutes without resting. Both physicians agreed that Williams was exhibiting significant pain behavior, and on physical examination, they found significant tenderness and reduced range of motion in Williams' lower spine. One of the physicians also indicated that Waddell's signs were "equivocal" as to somatic pain. (Tr. at 325-27.) The physicians made substantially similar findings at a follow-up appointment two months later. (Tr. at 607-09.)

A discogram confirmed that one of Williams' vertebral discs was a source of pain. (Tr. at 458.) Because the March 11 steroid injection provided no relief, Dr. Boon then recommended intradiscal electrothermal annuloplasty (IDET), a minimally invasive procedure used to reduce pain from bulging discs. (Tr. at 320.) A surgeon performed the procedure on May 8, 2002, and under the best possible outcome, Boon anticipated relief in the next two to three months. (Tr. at 307, 310.)

In connection with a previous application for social security benefits,[1] Dr. Cliff Phibbs, a non-examining physician, completed a forensic assessment on June 18, 2002. Summarily citing medical records, Dr. Phibbs found that Williams could lift twenty pounds occasionally and ten pounds frequently, and that he could sit or stand for six hours of an eight-hour workday. Dr. Phibbs also noted modest limitations on Williams' ability to perform postural tasks. (Tr. at 297-98.)

---

[1] Although Williams has applied for social security benefits in the past, the current record does not fully describe what happened. In their submissions, the parties do not address those proceedings, nor do they suggest that any prior benefit determinations influence the issues in the current litigation. To the extent medical evidence from those proceedings is part of the record here, that evidence receives due consideration, but there is otherwise no need to examine how the prior proceedings unfolded.

In ensuing visits to Dr. Boon, Williams reported no improvement in his pain. As a result, Dr. Boon proposed surgical fusion of the vertebrae adjoining the degenerative disc. (*See* Tr. at 544.) Following referral, an orthopedic surgeon took note of the recent IDET and recommended that further surgery be delayed, pending another radiological scan of the area. (Tr. at 542.) In the meantime, Williams continued to receive narcotics for pain. (*See* Tr. at 352, 718.)

In a letter on September 20, 2002, Dr. Boon offered her assessment of Williams' physical limitations. She found that Williams was unable to sit or stand for any prolonged period; that he would need to alternate between sitting and standing and move around frequently; and that he could lift no more than fifteen pounds occasionally. (Tr. at 305-06.)

Another non-examining physician, Dr. Gregory Salmi, performed a forensic assessment of Williams on June 24, 2003. After determining that Williams' reported pain was credible, Dr. Salmi determined that Williams could occasionally lift 20 pounds and frequently lift 10 pounds; that he could stand or walk for two hours, and sit for six hours, of an eight-hour workday; and that he had no limitations on his ability to perform postural tasks. (Tr. at 384, 386-87.)

Although Williams remained a candidate for spinal fusion throughout 2003, for much of that year, his treatment team did not take action. As part of efforts to renew physical therapy, Williams visited Dr. Lyle Gross, a physician from the Physical Medicine & Rehabilitation Center of the Mayo Clinic, on September 5, 2003. At this visit, Williams was using a cane and reported that he could not walk for more than twenty minutes without resting. (Tr. at 445-46.)

On examination, Dr. Gross found that Williams had reduced curvature of the spine and "obvious" discomfort, as well as "severely disabling back pain." But he found normal strength and reflexes, including normal results from a straight leg raise, and no indication of neurological

deficits. Dr. Gross proposed that Williams pursue physical therapy and, before proceeding with fusion surgery, that Williams obtain a second opinion. (Tr. at 446-47.)

Williams completed another course of physical therapy in October 2003, but he did not report any reduction in pain. (*See* Tr. at 435.) At an October 9, 2003 visit with Dr. Kathryn Stolp, another physician from the Physical Medicine & Rehabilitation Center, Dr. Stolp saw that Williams was "nearly in tears" from pain. On examination, her findings accorded with those Dr. Gross made a month earlier. (Tr. at 432.)

In November and December 2003, Williams' treatment team resumed efforts to proceed with the fusion surgery. Consistent with prior imaging, a radiological scan on December 4, 2003 verified that Williams still had a bulging disc in his lower back. (Tr. at 456.) After several consultations with his orthopedic surgeon, Dr. Paul Huddleston, Williams received the procedure on December 19, 2003. (Tr. at 461.) When Williams was discharged from the hospital four days later, Dr. Huddleston instructed him not to lift more than ten pounds and recommended the use of various orthotic aids. (Tr. at 574.)

**B.      February 2004 to January 2006:  Post-Surgical Rehabilitation**

The next record of treatment arises out of an emergency room visit on February 24, 2004. Williams reported severe leg and foot pain and was briefly admitted to the hospital. (Tr. at 567-68, 585-86.)

At his first follow-up visit with Dr. Huddleston on March 25, 2004, however, Williams said he was doing well, taking narcotic drugs only once every two to three days. Dr. Huddleston found that the surgery was healing well, and he recommended that Williams start doing some abdominal exercises. (Tr. at 527.) At their next visit on June 24, 2004, Williams reported "only a portion" of the pain from before the surgery, with increased discomfort from extended walking

5

or physical activity. Dr. Huddeston recommended that Williams stop using orthotic aids and that he consult a physical therapist. (Tr. at 526.)

At the ensuing consultation, Williams reported that he was suffering a different kind of back pain than what he had before the fusion surgery, and that he could walk one to two blocks before starting to suffer discomfort. (Tr. at 647.) Williams did not, however, resume physical therapy sessions.

Williams evidently received no further treatment until his next surgical follow-up visit on December 20, 2004. Because Dr. Huddeston was not available, Williams met with a different orthopedic surgeon. Williams said he was not doing very well, and that his pain substantially worsened in August 2004 after his home flooded and he did significant heavy lifting. During the examination, however, the surgeon found no complications. She prescribed a non-narcotic, anti-inflammatory medication and recommended that Williams start physical therapy. (Tr. at 524.)

The record does not say whether this course of physical therapy was effective in reducing pain. (*See* Tr. at 641.) At his next surgical follow-up on May 3, 2005, with yet another surgeon, Williams reported that his pain had progressively worsened since the August 2004 flooding. The surgeon found that Williams walked normally, but that he still had tenderness and limited range of motion in his lower spine. Though the fusion had healed without complications, Williams had continuing pain, and so Williams was referred to a neurologist for further consultation. (Tr. at 520-21.)

Neurological testing showed evidence of small fiber neuropathy in Williams' extremities. (Tr. at 596.) But his treatment team did not find this condition susceptible to treatment, and they instead proposed that Williams enter an outpatient program at the Pain Rehabilitation Center of

6

the Mayo Clinic. (Tr. at 514, 518.) As one physician observed, "The hope is that [Williams] can try and become more active and work toward desensitization." (Tr. at 592.)

On his entry to the pain rehabilitation program on June 16, 2005, Williams was assessed by a physical therapist. Williams reported fairly severe pain. He further indicated that he could stand for no more than five minutes, and sit or walk for no more than twenty minutes, without suffering discomfort. On examination, the physical therapist observed that Williams had limited range of motion in his spine. This therapist recommended that Williams work toward twenty to thirty minutes of aerobic exercise. (Tr. at 636-37.)

Over the next three weeks, Williams was frequently assessed for pain, and he engaged in multiple sessions of physical therapy. At an early session, Williams succeeded in exercising for ten minutes, although he exhibited pain throughout. (Tr. at 632.) By the end of the program, however, Williams demonstrated improvement. On his completion of the program, one physical therapist recommended that Williams do aerobic exercise three to five days per week, for twenty to thirty minutes at a time. (Tr. at 612, 617.)

While in the program, Williams also received psychological testing. One of these tests was designed to assess "pain catastrophizing," which is potentially indicates somatic pain. This test indicated that Williams did not have a significant level of pain catastrophizing. (Tr. at 1014.)

At this juncture, Williams stopped receiving direct treatment from the Mayo Clinic and returned to ongoing care from Dr. Smith, his primary care physician. At a visit on July 29, 2005, Dr. Smith urged Williams to use the techniques he learned from the pain rehabilitation program. (Tr. at 709.) But during several visits in the remainder of 2005, Williams continued reporting severe pain, and Dr. Smith soon considered other options. They included transcutaneous electrical nerve stimulation (TENS) and the resumption of narcotic medications. (Tr. at 707-09.)

7

On January 24, 2006, Williams visited Dr. Smith with a different complaint, knee pain. Seeing that one of Williams' knees was bruised, Dr. Smith attributed the pain to an injury. (Tr. at 692.) Although the record implies that Williams visited Dr. Smith in the ensuing months, the documentation from those visits is not part of the record.

**C.      March 2006 to October 2008:  Treatment after Application for Benefits**

Williams filed his current application for social security benefits on March 8, 2006. (Tr. at 82.) During this process, Williams was examined by Dr. Ward Jankus on May 10, 2006. Williams reported that he was suffering severe pain and was taking narcotics again. He was also wearing a TENS unit, which according to Williams, helped dampen his pain. (Tr. at 733-34.)

On examination, Dr. Jankus found there was moderate tenderness in Williams' lower spine, and limited range of motion there, but no muscle spasms. Aside from some stiffness in Williams' gait, Dr. Jankus did not find any other objective problems. (Tr. at 734-35.)

Williams also received another forensic assessment from Dr. Salmi on May 22, 2006. He found Williams could lift twenty pounds occasionally and ten pounds frequently; could stand or walk from two to four hours of an eight-hour workday; could sit for six hours, so long as there were opportunities to stand and relieve his discomfort. Dr. Salmi also indicated that Williams' pain was proportionate to what could be expected from his impairments. (Tr. at 738-39, 742.)

In a forensic mental health assessment on May 23, 2006, a psychologist separately found no indication that Williams was suffering from any somatic disorders. (Tr. at 745, 751.)

In exam notes from visits in May and June 2006, Dr. Smith indicated that the narcotics were effective in controlling Williams' pain. At one point, Dr. Smith observed that the pain was "well-controlled." (Tr. at 928, 930.) But Williams continued to report severe pain. Dr. Smith

8

increased the narcotics dosage and referred Williams to a pain clinic for further treatment. (Tr. at 920.)

When visiting the clinic in July and August 2006, Williams asked whether he would be an appropriate candidate for an implantable narcotics delivery pump. A physician recommended against this, instead proposing that Williams receive physical therapy and occupational therapy evaluations. (Tr. at 904-05, 914.)

The occupational therapy evaluation took place on August 22, 2006. Williams reported severe back pain, and stated that he had problems with many household tasks, including bathing, dressing, and cooking. He also admitted that, after his discharge from the Mayo pain rehabilitation program in July 2005, he stopped exercising at home about a month later. (Tr. at 886-88.)

At a physical therapy evaluation on August 24, 2006, the therapist observed that Williams could sit twenty minutes and stand five minutes before changing position. Williams was able to walk for one and a half minutes before stopping due to pain, and he was able to carry ten pounds but not fourteen pounds. Based on these results, the therapist concluded that Williams was not amenable to physical therapy. (Tr. at 883-85.)

Williams also received various psychological tests in September 2006, and in the results, he had a high somatization score. (Tr. at 796-97.) The psychologist who administered the tests observed, "It was also somewhat apparent that [while taking the test] he was presenting as an individual whose performance was affected by pain." Interpreting the test results in a report on September 26, 2006, that psychologist concluded,

> [Williams'] histrionic personality tendencies would indicate that he is over reporting symptoms of pain. This is not to say that [Williams] does not have pain, but rather that he experiences pain more intensely than most individuals.

(Tr. at 871.)

9

Williams then went back to Mayo Clinic for further evaluation of his pain. He again was seeking an implantable drug pump, or alternatively, an electrical stimulator for his spinal cord. At his initial visit on January 15, 2007, the examining physician noted that Williams displayed multiple pain behaviors, and that he "nearly jump[ed] out of my reach when I lightly touch[ed] his back." Based on Williams' history and the results of the exam, this physician recommended against the pump or the stimulator. (Tr. at 949, 951.)

Dissatisfied with this result, Williams sought a second opinion from another physician at Mayo. At a visit on February 20, 2007, this physician observed,

> [Williams] did demonstrate significant pain behaviors including catastrophizing and somatization and I was very frank and pointed these out and these did diminish somewhat. . . . The patient was initially very jumpy with light palpation of his back. When I told him he needed to stop doing that, he did and the examination became more focal . . . .

On completion of the exam, this physician diagnosed Williams with chronic back pain and small fiber neuropathy, and otherwise concurred with his colleague's decision against an implantable pump or stimulator. (Tr. at 947-48.)

In the ensuing months, efforts to treat Williams' pain reached an impasse, and Dr. Smith continued to manage this pain through narcotics. (*See* Tr. at 848.) Williams then turned to Dr. David Schultz, a pain physician and surgeon at the MAPS Clinic. Consistent with what others had observed beforehand, Dr. Schultz found tenderness and limited range of motion in Williams' lower back, but no significant limits on strength or reflexes. Dr. Schultz gave Williams a steroid injection, and proposed that they await the results before considering more invasive treatment options. (Tr. at 974-77.)

Although Williams received various forms of mental health treatment in preceding years, he resumed psychotherapy in January 2008, and there was one new development that merits brief

mention. At a visit on January 16, 2008, his therapist diagnosed him with somatic disorder, and Williams' histrionic or exaggerated pain behaviors were a common topic at ensuing visits. (Tr. at 837, 840, 842.)

Because the steroid injection was ineffective, Dr. Schultz took a discogram of Williams on February 22, 2008. From this procedure, Dr. Schultz found that Williams had degeneration in a second vertebral disc, but that the back pain was still originating from the site of the previous fusion. Dr. Schultz added that during the procedure, "[Williams'] pain tolerance was noted to be normal and [his] responses are deemed to be valid." (Tr. at 953.) Dr. Schultz proposed that Williams be given trial use of a spinal cord stimulator, to see whether this would help control the pain. (*See* Tr. at 952.)

On September 30, 2008, Dr. Smith answered a physical disability questionnaire regarding Williams. Dr. Smith opined that Williams had chronic low back pain and limited movement in his hips, but that Williams' pain was controlled "reasonably well" with medication. Dr. Smith further indicated that Williams could not walk for more than one block without severe pain; that he could not sit or stand for more than ten minutes at a time; that he could not sit, or stand and walk, for more than two hours of an eight-hour workday; and that he could not lift more than ten pounds. To accommodate Williams' pain, Dr. Smith further noted that Williams would need an unscheduled break ten times every workday. (Tr. at 995, 997-99.)

Williams received a trial with the spinal cord stimulator in October 2008. In an ensuing evaluation on October 15, 2008, Williams reported that his pain was much reduced, and that he was taking narcotics less often. Although a permanent implant was recommended, the record does not say whether this occurred. (Tr. at 893-94.) At an ensuing physical therapy evaluation

on October 20, 2008, Williams was able to stand for five minutes and walk for ten to twenty minutes. (Tr. at 1007.) This evaluation is the most recent medical evidence in the record.

**D.     Proceedings before the ALJ**

Williams' application for social security benefits was denied initially and on reconsideration, and pursuant to his request, a hearing was held before an Administrative Law Judge (ALJ) on October 23, 2008. (Tr. at 19.) In the hearing, the ALJ presented three hypothetical scenarios to a vocational expert.

In the first scenario, a person was able to lift twenty pounds occasionally and ten pounds frequently; could stand for two hours, and sit for six hours, of an eight-hour workday; and perform certain postural tasks occasionally. In the second scenario, a person had comparable limitations, except that the person could walk no more than twenty minutes without resting. The vocational expert opined that this person could work as a cashier, mail clerk, or office clerk. (Tr. at 63-64.)

For the third scenario, the ALJ further modified the limitations from the second scenario, indicating that the person needed two unscheduled thirty-minute work breaks. The vocational expert opined that these limitations would preclude employment. (Tr. at 68.)

The ALJ issued a decision on November 14, 2008. In relevant part, the ALJ found that Williams had severe impairments including somatoform disorder and degenerative disc disease. Regarding the back pain, the ALJ initially noted that Williams had normal strength and reflexes, and that the pain was mitigated by the fusion surgery and use of the TENS unit. The ALJ also found that Williams' pain did limit his ability to work, but that Williams exaggerated the severity of his pain because of his somatoform disorder. (Tr. at 12, 15-16.)

Adopting the second hypothetical scenario from the hearing, the ALJ determined that Williams was capable of a modified range of light work, including the suggested jobs of cashier, mail clerk, or office clerk. As a result, the ALJ concluded that Williams was not disabled, thus denying any benefits. (Tr. at 16-17.)

In the decision, the ALJ cited few medical records. After recounting Williams' fall in March 2001, and the spinal fusion in December 2003, the ALJ discussed the knee pain Williams reported to Dr. Smith on January 24, 2006. The ALJ otherwise did not cite medical records or other documents where Williams' physical limitations were evaluated by physicians, physical therapists, or occupational therapists. (*See* Tr. at 12, 15-16.)

## II. ANALYSIS

Williams principally asserts that, when the ALJ determined the limitations on his ability to work, the findings were not supported by substantial evidence. In particular, Williams argues that the ALJ did not give sufficient weight to the opinions of his treating physicians. He further contends that the ALJ did not properly assess the credibility of his complaints of pain. Because these assessments are not sound, Williams adds, the adopted vocational hypothetical accordingly did not reflect his limitations. The Commissioner generally counters that the findings of the ALJ are supported by substantial evidence.

### A. Standard of Review

On review of the decision of an ALJ regarding social security benefits, a court examines whether the findings of the ALJ are supported by substantial evidence in the record as a whole. 42 U.S.C. § 405(g); *Scott ex rel. Scott v. Astrue*, 529 F.3d 818, 821 (8th Cir. 2008). Substantial evidence is such relevant evidence that a reasonable mind might accept as adequate to support a conclusion. *Pate-Fires v. Astrue*, 564 F.3d 935, 942 (8th Cir. 2009) (quotation omitted).

When assessing whether there is substantial evidence, a court must consider evidence that supports, and that which contradicts, the factual findings of the ALJ. *Hartfield v. Barnhart*, 384 F.3d 986, 988 (8th Cir. 2004). Those findings are not subject to reversal just because substantial evidence may also support another outcome. If it is possible to draw differing conclusions from the record, but one of those conclusions supports the findings by the ALJ, those findings must be affirmed. *Goff v. Barnhart*, 421 F.3d 785, 789 (8th Cir. 2005).

B.     **Evidence from Treating Professionals**

Williams argues in part that the ALJ did not give sufficient weight to the opinions of his treating physicians. As Williams correctly observes, opinions of a treating or examining physician are ordinarily entitled to substantial weight. *See, e.g., Forehand v. Barnhart*, 364 F.3d 984, 986 (8th Cir. 2004).

When discounting the opinion of a treating physician, the ALJ must give good reason to do so. 20 C.F.R. § 404.1527(d)(2). For instance, the ALJ may find that the treating physician has contradicted his or her own assessments elsewhere, or where other physicians' opinions are supported by superior medical evidence. *See, e.g., Wildman v. Astrue*, 596 F.3d 959, 964 (8th Cir. 2010). Where an ALJ summarily discounts an opinion from a treating physician, but the opinion is consistent with objective medical evidence, it is error for the ALJ to reject the opinion. *Singh v. Apfel*, 222 F.3d 448, 452 (8th Cir. 2000).

In the current matter, the ALJ rendered a decision that devoted virtually no discussion to the work or opinions of Williams' treating physicians. Aside from Williams' spinal fusion, the ALJ only mentions one appointment with Dr. Smith in January 2006, and that visit involved an unrelated injury to Williams' knee. Assuming that the opinions of Williams' treating physicians were considered, the ALJ did not address those opinions or explain why they were less credible.

14

Conceding that the ALJ did not address the opinions of Williams' treating physicians, the Commissioner argues that this omission is harmless error. He contends that, because there was no objective evidence to support the opinions of Williams' treating physicians, the ALJ was not obligated to address them.

This Court disagrees. When the opinions of Williams' treating physicians are compared to objective evidence in the record, it shows that the physicians' opinions are consistent with objective evidence. This can be illustrated by Dr. Smith's assessment of September 30, 2008, where he indicated that Williams had severe, chronic back pain and could not lift more than ten pounds, among other limitations.

The finding of pain is corroborated by the opinions from many other treating physicians, and though some found evidence that Williams exaggerated this pain, all agreed that there was an underlying objective cause for the pain.

Regarding Williams' ability to lift, the record shows that immediately after the spinal fusion, he was directed not to lift more than ten pounds. Although Williams appeared to improve as the fusion healed, these gains were lost during the August 2004 flooding, when he attempted heavy lifting. When Williams was assessed by a physical therapist on August 24, 2006, he was unable to carry more than ten pounds.

This objective data provides some support for Dr. Smith's September 30 assessment. By comparison, in the assessments from non-treating physicians, they found that Williams could lift twenty pounds occasionally. Dr. Smith's opinion, therefore, has more objective support than the opinions from the non-treating physicians. In these circumstances, it was not harmless error for the ALJ to entirely disregard the opinion of Dr. Smith, or consistent opinions from other treating physicians.

The ALJ did not supply good reason for disregarding the opinions of Williams' treating physicians, even though their opinions are supported by objective medical evidence. To the extent the ALJ failed to give due consideration to those opinions, therefore, the findings of the ALJ are not supported by substantial evidence.

### C. Credibility of Subjective Reports of Pain

Williams further argues that, when his reports of pain were discounted by the ALJ, there was not sufficient cause to do so. This argument derives from the five-factor standard that the Eighth Circuit first adopted in *Polaski v. Heckler*. 739 F.2d 1320, 1322 (8th Cir. 1984) (favorably citing a prior version of 20 C.F.R. § 404.1529(c)(3)).

When evaluating subjective complaints of pain pursuant to this standard, relevant factors include, but are not limited to, the claimant's daily activities; the duration, intensity, and severity of pain; precipitating and aggravating factors; the dosage and effectiveness of medication; and whether the pain causes functional restrictions. *See, e.g., Travis v. Astrue*, 477 F.3d 1037, 1042 (8th Cir. 2007).

As the Commissioner has indicated in his papers, the ALJ is not required to explicitly cite or discuss these factors, so long as the decision shows that they were duly considered. Even if the factors are not addressed in depth, if the ALJ has good cause to discount the credibility of the claimant, a court should defer to this assessment. *See, e.g., Halverson v. Astrue*, 600 F.3d 922, 932 (8th Cir. 2010) (quotations omitted).

In the decision here, the ALJ made some findings about Williams' daily activities. But there is little discussion about the duration or severity of pain, the factors that aggravate pain, or the functional restrictions that resulted from pain. Most of that discussion, moreover, addresses migraines instead of back pain. The ALJ then concluded that, to the extent Williams reported

16

severe pain, these complaints were not consistent with his objective medical condition and thus were psychosomatic. (*See* Tr. at 15-16.)

Regarding the dosage and effectiveness of pain treatments, the ALJ found that Williams controlled his pain through narcotics and use of a TENS unit. These findings, however, do not reasonably reflect the scope and degree of treatment that Williams received for pain. Williams took narcotic medications for years. Though Dr. Smith sometimes found narcotics adequate, this did not stop Williams' physicians from considering other treatments, including implantation of a spinal cord stimulator.

Notwithstanding this recommendation, there is no indication that the ALJ considered it. The ALJ's decision also does not reconcile Williams' somatic disorder with the serious efforts to treat his back pain.

The ALJ's decision does not expressly recite the *Polaski* factors, but more importantly, it does not reflect appropriate consideration of those factors. The ALJ instead emphasized somatic disorder, to the exclusion of other medical evidence regarding the severity of Williams' pain. Because of this omission, the ALJ did not have sufficient cause to discount Williams' subjective reports of pain. For this reason, there is not substantial evidence to support the ALJ's finding on this point.

### D. Ability to Work

Williams otherwise challenges the ALJ's findings about his residual functional capacity, or in more practical terms, the findings regarding his ability to work. In the decision, Williams argues, the ALJ set forth functional limitations that are inconsistent with the hypotheticals that were established during the hearing. But there is no need to resolve this inconsistency.

17

As the preceding analysis indicates, to the extent the ALJ made findings about Williams' medical limitations and subjective complaints of pain, they were not supported by substantial evidence. Because the ALJ relied on those findings to determine Williams' ability to work, this determination is not supported by substantial evidence either. *See generally Robson v. Astrue*, 526 F.3d 389, 392 (8th Cir. 2008) (holding that, where an ALJ adopts a hypothetical to define a claimant's ability to work, it does not constitute substantial evidence unless it accurately captures the claimant's limitations).

## III. CONCLUSION

In the findings about Williams' medical condition, the ALJ did not discuss the opinions of Williams' treating physicians or explain how these opinions were inconsistent with objective medical evidence. And when evaluating Williams' subjective complaints of pain, the ALJ did not give enough consideration to all relevant factors. There is not substantial evidence to support these findings, and because the ALJ relied on those findings to determine Williams' ability to work, substantial evidence is lacking there as well. Being duly advised of all the files, records, and proceedings herein, **IT IS HEREBY RECOMMENDED THAT:**

1. Williams' motion for summary judgment (Doc. No. 27) be **GRANTED.**
2. The Commissioner's motion for summary judgment (Doc. No. 35) be **DENIED.**
3. The ALJ's decision of November 14, 2008 be **REVERSED AND REMANDED** to the SSA for further proceedings consistent with this report.
4. This litigation be **DISMISSED WITH PREJUDICE** and judgment entered.

Dated this 1st day of February, 2011. /s  *Jeanne J. Graham*

                                                                                                             JEANNE J. GRAHAM
                                                                                                              United States Magistrate Judge

**NOTICE**

Pursuant to Local Rule 72.2(b), any party may object to this report and recommendation by filing and serving specific, written objections by **February 16, 2011.** A party may respond to the objections within fourteen days after service thereof. Any objections or responses filed under this rule shall not exceed 3,500 words. The district court judge shall make a de novo determination of those portions to which objection is made. Failure to comply with this procedure shall forfeit review in the United States Court of Appeals for the Eighth Circuit.